*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

THOMAS CRESS,

*Petitioner-Appellant,*

*v.*

No. 05-1798

CARMEN PALMER, Warden, Riverside Correctional
Facililty,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 04-00159—Robert Holmes Bell, Chief District Judge.

Argued: March 8, 2007

Decided and Filed: April 5, 2007

Before: DAUGHTREY and ROGERS, Circuit Judges; OBERDORFER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Bridget M. McCormack, MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellant. Janet A. VanCleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Bridget M. McCormack, MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellant. Janet A. VanCleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge. The petitioner, Thomas Cress, is a Michigan state prisoner serving a life sentence for first-degree felony murder. He appeals from the district court's order dismissing his second habeas petition, filed pursuant to 28 U.S.C. § 2254. The petitioner contends that his due process rights were violated when (1) physical evidence related to his case was destroyed after his appeals were completed, (2) the state post-conviction court rejected as incredible the recantation evidence that he proffered, and (3) the state post-conviction court did not grant him relief based on evidence indicating his innocence. The district court denied relief on

---

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

the merits.  Because the record establishes that the petitioner's claims are not cognizable on habeas review, we conclude that the district court should have dismissed the petition for lack of jurisdiction, and we therefore affirm the order of dismissal, but for a different reason from that given by the district court.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

In 1985, a Battle Creek jury found petitioner Cress guilty of murdering Patricia Rosansky and convicted him of first-degree felony murder, resulting in the imposition of a life sentence.  There were no eyewitnesses to the crime, and hair and semen samples recovered by investigators failed to connect Cress to the murder.  The main evidence introduced by the prosecution at trial consisted of the testimony of several witnesses who said that Cress had told them that he committed the murder.  Cress appealed his conviction unsuccessfully and then sought post-conviction relief in state court, again without success.  In 1989, he filed a habeas petition in federal district court that was dismissed on the merits.  *See Cress v. Grayson*, No. 1:89-cv-01020 (W.D. Mich. Aug. 30, 1991).  On appeal, we affirmed the district court's order of dismissal.  *See Cress v. Grayson*, No. 91-2095, 1992 WL 31305 (6th Cir. Feb. 20, 1992).

In 1997, Cress brought a motion for a new trial in state court, claiming that he was entitled to relief because key prosecution witnesses had recanted their testimony and another person had recently confessed to committing the murder.  The state court initially granted Cress's motion for a retrial, but reversed itself after reopening the matter and taking more evidence.  The Michigan Court of Appeals then reversed this denial of a new trial.  *People v. Cress*, 645 N.W.2d 669 (Mich. Ct. App. 2002).  Finally, the Michigan Supreme Court reversed the Court of Appeals, after remanding for a hearing on the issue of whether the prosecution had destroyed evidence in bad faith. *People v. Cress*, 664 N.W.2d 174 (Mich. 2003).  On remand, the state trial court found as a matter of fact that no bad faith was involved in the conduct at issue.

Having exhausted his state remedies, Cress filed this second habeas petition, which was referred to a magistrate judge for a report and recommendation.  The magistrate judge subsequently recommended that the petition be summarily dismissed because it was untimely and because it failed to state claims cognizable on habeas.  The district court ostensibly dismissed the petition on the merits, concluding that none of the claims established a federal constitutional violation.

The district court denied Cress's request for a certificate of appealability, but we granted the request "with respect to Cress's claims that: (1) the state courts improperly analyzed his claim that the prosecution destroyed potentially exculpatory evidence; (2) the state courts improperly ignored his recantation evidence; and (3) his continued incarceration in light of compelling evidence of his actual innocence and another's guilt violates due process and constitutes cruel and unusual punishment."  The certificate also directed the parties to brief a fourth issue: "whether, because Cress filed an earlier unsuccessful habeas corpus petition, the district court should have transferred this petition to this court for consideration as a motion for an order authorizing the district court to consider a second or successive habeas application pursuant to *In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997), and if so, what effect the district court's failure to transfer the petition has on the procedural posture of this case."

## A.  Destruction of Evidence

The record reflects that in 1992, after completion of Cress's trial, direct appeals, and the first round of state and federal post-conviction challenges, certain physical evidence relating to his case was routinely discarded – in particular, "a sanitary napkin with sperm contained thereon and hairs with at least one intact root, both of which were seized as evidence from the person of the deceased or in close proximity thereto."  The destruction of this evidence was part of a statewide effort to

increase storage space, pursuant to a request from the state police department that all local offices review cases in which they had evidence in long-term storage at the state police facility, in order to determine whether that evidence could be discarded. The clean-up effort was initiated when letters with the relevant case numbers (but not names) were sent from the state police headquarters to individual posts. The request forms sent to Battle Creek police, including one referencing Cress's case number, were reviewed and then signed by the post commander and forwarded to the prosecutor's office. Prosecutor Jon Sahli testified that when he received these forms, he had the appeals secretary check the status of the relevant cases and, if the appeal was over, authorize the destruction. Sahli asserted that someone had written "closed, no appeal" on the form pertaining to Cress's case, that he accordingly believed the case was completed, and that he signed the authorization in May 1992. The evidence related to Cress's case was discarded in the fall of 1992, along with evidence from 69 other (mostly murder) cases, under the oversight of the state police department's long-term storage supervisor.

Cress now suggests that the destruction of evidence related to his case was motivated by the *pro se* motion for transcripts that he submitted to the prosecutor's office on May 8, 1992. A note found on this motion drafted by Prosecutor Sahli's secretary indicated that Sahli had said that someone from his office should attend the hearing regarding Cress's motion. Sahli later testified that he did not recall being apprised of Cress's motion for trial transcripts, but that if he was, then he would have ordered that the on-duty assistant prosecutor handle the motion.

## B. Recantation Evidence

The sole recantation evidence in the record consists of the transcript of an interview of prosecution witness Candy Cross by a Battle Creek detective named Dennis Mullen and Mullen's testimony about this interview at a state court post-conviction hearing. The record does not contain any sworn testimony from Cross. In the interview, she said that she knew nothing about Rosansky's murder before Cress was arrested and that she had always believed that he was innocent. Cross also repeatedly insisted that she did not testify against Cress at trial. However, Mullen confronted Cross with trial transcripts showing that she had, in fact, testified at trial to the effect that Cress had told her on three separate occasions that "he had killed a girl named Patty and had put her in a ditch" and that he had also driven Cross to the location where he purported to have left her body. When Mullen continued to press her, Cross maintained that she had no recollection whatsoever of testifying against Cress, but she did say that if she had so testified, "I . . . was mistaken because I would not purposely tell a lie in court." Cross also suggested that perhaps she "got confused" and testified against Cress inadvertently, noting that lawyers "twist things" when questioning witnesses. Though Cross never affirmatively stated in the interview that she had given false testimony against Cress, she did state that if she had testified against him she was "willing to take it back."

During this interview Cross also suggested that two other prosecution witnesses, her sister, Cindy Leslie, and her brother-in-law, Walter Moore, may have testified falsely. At Cress's trial, Leslie testified that Cress had confessed to her that he had murdered Rosansky and that he had taken Leslie to an area where he said that he had left Rosansky's dead body. Leslie additionally stated that Cress told her that he had hit Rosansky in the head and that Leslie returned to the area identified by Cress with her sister and two other prosecution witnesses, who had then indicated to her that Cress had told them "the same thing" and taken them to the same place. Leslie also testified at trial that she contacted the police to report Cress shortly after this incident and that, although she was not expecting a reward at the time of this report, she later received a $5000 reward from a crime tip hotline. There is no indication in the record, other than uncorroborated hearsay testimony, that Leslie's trial testimony was untruthful or that she ever wavered from it.

Similarly, there is no evidence in the record that Moore himself ever recanted his testimony; he committed suicide while in prison shortly after Cress's trial. At trial, Moore had testified that

Cress had asked him several different times whether he had ever had sex with a dead woman. He also said that on a separate occasion Cress offered to show him "'where Patty Rosansky was found'" and then took him to a particular area. Moore further testified that after these incidents he had a specific conversation about Rosansky with Cress while he was staying with him. He stated that after the two had smoked a joint of marijuana, Cress "brought up the subject about – he said, 'I killed Patty Rosansky.' . . . and he went into detail," saying that he had raped her when she refused to have sex with him, that he hit her with a tire iron because she was screaming, that he had meant only to knock her out "because he was so scared," but that he had actually killed her instead. According to Moore, Cress confessed to him "that he still had her body for about three or four days after she was dead, and he tried to have sex with her three times after that, after she was dead . . . . [before h]e took [her] out to Fort Custer."

At trial, Moore had also acknowledged that he was wanted by police at the time Cress made the alleged statements to him and that after he had himself been arrested and confessed to his own charges, he had requested to speak to the officer working on Rosansky's case because he believed he knew who killed her. Moore asserted that he had not been offered anything of value in exchange for his initial statement, but he testified that after he told the detective about what Cress had said, he entered into an agreement under which he would plead guilty to seven burglary-related charges, another charge would be reduced, and a remaining charge "would be dropped for [his] testifying in the Cress case." He added that he had not been told how he should testify.

Finally, we note that when Cross later testified at a state post-conviction hearing, she refused to recant her trial testimony. She said that her statements in her interview with Mullen were made because "he intimidated [her]" and "threatened [her]."

## C. Other Evidence of Actual Innocence

In his habeas petition, Cress also contended that convicted-murderer Michael Ronning's confession to the Rosansky murder proves Cress's innocence and entitles him to relief. While serving a life sentence without the possibility of parole for a murder in Arkansas, Ronning confessed to the murder of Rosansky pursuant to an elaborate agreement arising from the efforts of Detective Mullen. Mullen apparently contacted Ronning in Arkansas and indicated to him his belief "that somebody had been convicted of a crime that he thought [Ronning] was guilty of." Ronning acknowledged that when Mullen first contacted him, he protested that he had never killed anyone. However, he changed his story after Mullen "offered that [he] could come to Michigan to serve out the remainder of [his] sentence if [he] was willing to . . . cooperate." Many of Ronning's family members resided in Michigan, and Ronning indicated that attaining proximity to his family – as well as his dissatisfaction with the Arkansas prison system – strongly motivated his subsequent confession to the Rosansky murder. Apparently a serial killer, Ronning also thought that he might be able to avoid a death sentence for any of the other murders he had committed by "work[ing] it out through Michigan first because Michigan is a non-death penalty state." Indeed, Ronning explained that the agreement that he ultimately struck required any other states to return him to Michigan, provided that he was convicted of homicide in Michigan.

Four witnesses testified that Ronning had at some point indicated to them that he was confessing in order to be transferred to a Michigan facility. Most notably, Melissa Meyer, Ronning's half-sister, testified at the petitioner's post-conviction hearing that Ronning had sent her letters while he was still in Arkansas that said "he was working on something that could enable him to spend his [s]entence in a prison in Michigan." According to Meyer, when she later visited Ronning he conveyed to her that implicating himself in Michigan murders was "his way of being able to spend his [s]entence here in Michigan" but that, despite his confessions, he also insisted that he was not actually involved in the Michigan murders. She said that Ronning had confided in her that he had obtained all of the available transcripts for the Michigan murders from the secretary of

a former attorney whom he had befriended, and that "he had read all of the transcripts and documents involved in all the murders, and had memorized everything in detail to answer any questions that could have been asked."

Ronning refused to divulge specific information about crimes he had purportedly committed in Michigan before he "reached an agreement with the prosecutor and the police force . . . in Michigan." The agreement eventually reached was ratified by the governors of Michigan and Arkansas and permitted Ronning to serve the remainder of his sentence in Michigan, subject to his undergoing a polygraph examination "as to the truthfulness of the numbers that were involved in [his] confessions." As a result, when Ronning took the polygraph test, he was asked only whether he had committed three murders in Michigan; no specific reference was made to the Rosansky murder. The polygraph examiner was of the opinion that Ronning's answers about the number of murders that he had committed in Michigan was truthful. After the polygraph, Ronning provided what purported to be a full confession, parts of which corresponded to evidence in the record of Cress's trial. Other statements that Ronning made, however, conflicted with the evidence, and he was unable to identify the location where he purportedly murdered Rosansky and disposed of her body. Indeed, the videotape of his unsuccessful efforts to locate or even describe the crime scene correctly was, in the assessment of the state court judge, "[p]erhaps the most compelling evidence which cause[d] this Court to . . . conclude that Mr. Ronning is a false confessor."

In 1996, Cress also underwent a polygraph examination, in which he denied participation "in the killing of Patty (Patricia) Rosansky" or in "put[ting] Patty's (Patricia Rosansky's) body in that wooded ravine (in or near Fort Custer)." He also denied telling anyone that he had killed Rosansky. The polygraph examiner was of the opinion that "Mr. Cress was qualifiedly telling the truth" in his responses to the few questions that he was asked, reporting as follows:

> There are two reasons for the qualification of this opinion. First, in matters such as this one it is common to have significantly greater amounts of detailed information about the offense under investigation than was available here. Such detailed data ordinarily provides a firmer basis for the formulation of relevant test questions and for the development of specific testing procedures which contribute to the interpretation of polygraphic data. Second, based upon discussions with Mr. Cress during his polygraph examination, it was my impression that he has a somewhat limited capacity for understanding the necessity for specific instructions that were given during the testing. Although it is my opinion that neither of these concerns was likely to have influenced significantly the outcome of Mr. Cress's examination, additional polygraph testing may be useful if there is an interest in clarifying their role.

There is no indication in the record that Cress submitted to any further polygraph testing.

## II. *DISCUSSION*

### A. Standard of Review

"We review a district court's legal conclusions in a habeas proceeding *de novo*, and its factual findings for clear error." *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003) (citing *Vincent v. Seabold*, 226 F.3d 681, 684 (6th Cir. 2000)). When a petitioner "in custody pursuant to the judgment of a State court" seeks habeas review of "any claim that was adjudicated on the merits in State court," a habeas writ may issue only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law as determined by the Supreme Court if either (a) "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law," or (b) "the state court considers facts that are materially indistinguishable from a relevant Supreme Court case and arrives at an opposite result." *Hill*, 337 F.3d at 711 (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). An "unreasonable application" of clearly established federal law occurs if (a) "'the state court identifies the correct governing legal rules from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,'" or (b) the "state court invokes a Supreme Court case and unreasonably extends its legal principle to a new context where it should not apply, or fails to extend it where it should apply." *Id.* (quoting *Williams*, 529 U.S. at 407).

## B. Cognizability of Cress's Claims

It is undisputed that the habeas petition underlying this appeal is Cress's second habeas petition and that it was reviewed by the district court without prior authorization of this court. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires such authorization, *see* 28 U.S.C. § 2244(b)(3)(A) ("Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application."), and the Supreme Court has recently made clear that this authorization is jurisdictional. *See Burton v. Stewart*, 127 S.Ct. 793 (2007) (*per curiam*) (district court lacks jurisdiction to review second habeas petition without prior authorization from court of appeals).

However, when, as here, the original petition was filed pre-AEDPA, we must analyze whether the second or successive habeas petition would have survived under the pre-AEDPA "abuse of the writ" standard as set out in *McCleskey v. Zant*, 499 U.S. 467, 493-95 (1991). That standard did not require prior authorization from the court of appeals and "allows a second motion containing a new claim where the inmate can 'show cause for failing to raise [the issue in the first motion] and prejudice therefrom.'" *In re Hanserd*, 123 F.3d 922, 929 (6th Cir. 1997) (quoting *McCleskey*, 499 U.S. at 494) (alteration in *Hanserd*); *see also McCleskey*, 499 U.S. at 494 ("To excuse his failure to raise the claim earlier, he must show cause for failing to raise it and prejudice therefrom as those concepts have been defined in our procedural default decisions."). "[T]he reasonable unavailability of the factual basis for the claim" establishes cause for failing to raise the issue in the first habeas motion. *McCleskey*, 499 U.S. at 497. The cause determination turns on "whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process. The requirement of cause in the abuse-of-the-writ context is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." *Id.* at 498 (citations omitted). In order to show prejudice, "a petitioner must establish a constitutional error . . . [that] had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

In this case, many of the events that underlie Cress's current claims occurred well after he filed his initial habeas petition in 1989. The fact that his second petition does not therefore constitute an abuse of the writ under the standard set out above does not mean that his claims are cognizable on habeas review, however. Indeed, if the three constitutional claims that form the substance of this appeal had been included in his 1989 petition, they would have received the same treatment to which they must now be subjected. For the reasons set out below, we conclude that none of these claims is cognizable on federal habeas review.

The easiest claim to analyze is the petitioner's challenge to the validity of the state court's conduct of his post-conviction litigation, with respect to the denial of the opportunity to present recantation evidence. As the district court noted, the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review. *See Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002). We have clearly held that claims challenging state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254," because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)); *see also Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) ("States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." (citation omitted)). A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby*, 794 F.2d at 247. "Though the *ultimate* goal in" a case alleging post-conviction error "is release from confinement, the result of habeas review of the specific issue[ ] . . . is not in any way related to the confinement." *Id.* at 248. Accordingly, we have held repeatedly that "the scope of the writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings," noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration." *Id.* at 248, 247; *see also Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings can not [*sic*] provide a basis for federal habeas relief" (citing *Kirby*, 794 F.2d at 247)); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief").

The petitioner's other two claims relate indirectly and directly to his claim of actual innocence. With regard to the destruction-of-evidence claim, the district court held that *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood,* 488 U.S. 51 (1988), the leading cases on this issue, were inapplicable in this case because both *Trombetta* and *Youngblood* involved the pre-trial destruction of evidence. The district court concluded that because the Supreme Court has not clearly established that post-conviction destruction is a due process violation, the petitioner's claim in this regard could was not cognizable on federal habeas review. We agree, and we point out, in addition, that the state court conducted a lengthy evidentiary hearing and concluded that there is simply insufficient proof in this case to establish that the destruction of the stored evidence in Cress's case was carried out in bad faith. Even if Cress's allegations of bad faith were true, there is insufficient proof for us to conclude that the state court's decision was unreasonable.

In addition, case law from this circuit supports the conclusion that Cress's third claim is, likewise, not cognizable. Cress contends that, given "overwhelming" proof of his innocence, his continued incarceration violates his due process rights, an argument that has been characterized as a free-standing innocence claim when not coupled with allegations of constitutional error at trial. *See Schlup v. Delo*, 513 U.S. 298, 314-17 (1995) (explaining the difference between a procedural innocence claim, which can permit a petitioner to transcend procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive innocence claim, which is "'itself a constitutional claim'" (quoting *Herrera v Collins*, 506 U.S. 390, 404 (1993))). In the wake of *Schlup*, we have repeatedly indicated that such claims are not cognizable on habeas. *See, e.g.*, *Zuern v. Tate*, 336 F.3d 478, 482 n.1 (6th Cir. 2003) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding'" (quoting *Herrera*, 506 U.S. at 400)); *Staley v. Jones*, 239 F.3d 769, 780 n.12 (6th Cir. 2001) (federal habeas

jurisdiction "require[s] a claim of legal error in the original proceedings"). *But see House v. Bell*, 311 F.3d 767, 768 (6th Cir. 2002) (*en banc*), *opinion after certified question denied*, 386 F.3d 668 (6th Cir. 2004), *rev'd and remanded*, 126 S.Ct. 2064 (2006) (noting that "[t]he Supreme Court has assumed that 'in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant habeas relief *if there were no state avenue open to process such a claim*'" and therefore certifying questions to state court "in order to ascertain whether there remains a 'state avenue open to process [petitioner's freestanding innocence] claim'" (quoting *Schlup*, 513 U.S. at 314 n.28 (quoting *Herrera*, 506 U.S. at 417) (O'Connor, J., concurring))) (emphasis added in *House*)).

The Supreme Court considered a free-standing innocence claim in *Herrera*. There, the petitioner brought a second habeas petition alleging, *inter alia*, that because newly discovered evidence established his innocence, his execution would violate the due process clause of the constitution. *See* 506 U.S. at 396-97. The Supreme Court held that, assuming the existence of such a due process right, the petitioner's showing of alleged innocence was not strong enough to entitle him to federal habeas relief. *See id.* at 393, 417-19. The Court reviewed its habeas jurisprudence and observed: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. Although the Court noted that it had not previously held that a free-standing innocence claim was cognizable on habeas, it would

> . . . assume, for the sake of argument in deciding [Herrera's] case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Id.* at 417; *see also id.* at 419 (O'Connor, J., concurring) ("I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution. . . . [T]he execution of a legally and factually innocent person would be a constitutionally intolerable event."). Applying this somewhat amorphous and hypothetical "extraordinarily high" standard, the Court concluded that the evidence proffered by the petitioner fell "far short of any such threshold." *Id.* at 417; *see also Schlup*, 513 U.S. at 316 n.32 ("In *Herrera*, it was not necessary to determine the appropriate standard of review because petitioner had failed to make 'a truly persuasive demonstration of "actual innocence"' under any reasonable standard.").

We first point out the obvious – that this is not, in fact, a capital case. But, even given that ostensible limitation, we conclude that the new evidence proffered in this case simply cannot satisfy the hypothetical *Herrera* standard. Cress has presented a weak, unsworn recantation statement from one of several witnesses who testified at trial concerning the petitioner's repeated admissions of guilt; a confession from someone who was strongly motivated to confess falsely for ulterior reasons and who, according to other testimony, admitted to having confessed falsely; and a "qualified" polygraph report. Although this evidence, if presented at trial, might have weakened the prosecution's case against Cress, after he was convicted in a trial free of constitutional error, the burden of proof shifted to him. *See Herrera*, 506 U.S. at 400 ("Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." (citation omitted)). Clearly, it is a burden that the petitioner in this case has not been able to carry successfully.

### III. *CONCLUSION*

For the reasons set out above, we conclude that the petitioner has failed to establish that the claims brought in his second habeas petition are cognizable on habeas review. It follows that the district court correctly dismissed the petition, and we AFFIRM the district court's judgment to that effect.